IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| ANGELA WELLS, as | ) | |
| administrator of the estate | ) | |
| of Edwin Charles Wells, | ) | |
| Jr., a/k/a CJ Wells, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv600-MHT |
| | ) | (WO) |
| JENNIFER McCOVERY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

One month before he would have been released from
prison, Edwin Charles Wells, Jr.--a prisoner serving a
six-month sentence at one of the prisons operated by
the Alabama Department of Corrections (ADOC)--died
after being assaulted twice in the same day by the same
inmate.  Plaintiff Angela Wells (his mother and the
administrator of his estate) brings this lawsuit naming
as defendants, in their individual capacities, five
correctional officers at the prison: Jennifer McCovery,

Danarris Lovejoy, Steven Canty, Kelvin Key, and Anthony Crittenden.[1]  Plaintiff claims the defendants violated decedent Wells's Eighth and Fourteenth Amendment rights, as enforced through 42 U.S.C. § 1983, by failing to protect him from the inmate who ultimately caused his death.  She seeks damages and other relief. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

This cause is before the court on the defendants' motion to dismiss.  The defendants all contend that plaintiff fails to state a plausible claim for relief.[2] For the reasons that follow, the motion will be denied.

---

1. While the amended complaint does not specify that the plaintiff is suing the defendants in their individual capacities, context in the complaint and the motion to dismiss suggest the parties agree this is the case.

2. The defendants do not invoke qualified immunity in their motion to dismiss and affirmatively waive this defense in their response. *See* Defs.' Resp. (Doc. 39) at 4 ("The Defendants' motion does not assert a qualified-immunity defense or attempt to apply any standard relating to it.").

## I. MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Bailey v. Wheeler,* 843 F.3d 473, 480 (11th Cir. 2016).

To survive a Rule 12(b)(6) motion to dismiss, a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), but rather "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks

3

for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## II.  FACTUAL BACKGROUND

The allegations in the complaint, taken in the light most favorable to plaintiff, establish the following facts.

Decedent Wells failed a drug test during his state-court probation and was imprisoned for six months in the custody of the ADOC.  He had never been to prison before.  At first, he was housed at the Childersburg Work Release Center (a facility whose residents typically present a low risk of violence), but he was transferred to Easterling Correctional Facility after he was accused of unlawfully possessing a cellphone.  Easterling was known to house violent offenders, some of whom had serious mental illnesses. Before Wells's death, Easterling had many violent episodes and had been a target in Operation Restore

4

Order, an effort by prison authorities to regain
control of the facility by conducting a facility-wide,
unannounced search for contraband. While Wells was
there, Easterling housed twice as many inmates as it
was designed to hold and was understaffed. With some
exceptions, inmates generally resided together in
dormitories, intermingling nonviolent and violent
offenders.

On the morning of Wells's death, an inmate with an
unmanaged mental illness, known as "Boss Hog," attacked
him. The assault resulted in an incident report.
Standard prison practice required separation of inmates
involved in altercations unless they signed a peace
agreement, for there was a substantial risk that these
inmates would fight again. All defendant officers were
on duty when the attack occurred and would have been
informed of the incident report, but none of them
followed up on the initial assault. Later that day,
Boss Hog demanded Wells give him a cigarette. When

5

Wells did not comply immediately, Boss Hog slashed his throat.  Wells bled to death on the dormitory floor.

At the time of Wells's death, the defendant officers were together in a separate, less dangerous dormitory watching a football game on television.  No corrections officers were in the dormitory where his death occurred.  One basic corrections officer--not named in this lawsuit--was in a cubicle but could not leave the cubicle unless another officer was present. Inmates asked the cubicle officer for permission to take Wells to the infirmary but were denied because no correctional officer was present to escort them. Defendant McCovery was the only defendant who responded to a call for assistance, but, by the time she arrived, Wells had bled to death.

The Easterling staff did not contact Wells's family to inform them of his death.  Instead, his aunt learned of his death from fellow inmates.  When his family

contacted Easterling, the staff refused to share information beyond confirming he was dead.

ADOC investigated Wells's death. Four years after his death, criminal charges related to his death were presented to a grand jury, but the charges were no billed.

### III. DISCUSSION

Plaintiff brings ten counts, two against each defendant. The odd counts of the complaint allege that defendants were deliberately indifferent to decedent Wells's safety by failing to separate him from Boss Hog following the first assault. The even counts assert that defendants had actual, subjective knowledge that their decision to watch television in a separate dormitory posed a substantial and unreasonable risk of serious harm to Wells. These counts appear to describe different theories to assert the same claim: an Eighth Amendment failure-to-protect violation as enforced

through 42 U.S.C. § 1983.   Therefore, the court will assess whether the plaintiff has plausibly alleged that each defendant committed this constitutional violation.

### A. Failure-to-Protect Claim[3]

To succeed on a § 1983 Eighth Amendment failure-to-protect claim, a plaintiff must allege facts sufficient to show: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).   Plaintiff asserts that decedent Wells faced a substantial risk of serious harm, and that the defendants knew of the risk but consciously disregarded it, contributing to Wells's death.   The defendants contest that the plaintiff adequately alleges the requisite subjective knowledge.

_____

3. Although the plaintiff does not label her claims as failure-to-protect claims, she is describing such a claim.

## 1. Objectively Serious Harm

Two theories of liability exist for establishing a substantial risk of harm: a 'particularized-risk' theory and a 'generalized-risk' theory. *See Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016). Under a particularized-risk theory, the plaintiff must show that the decedent "was the target of a specific threat or danger." *Id.* Alternatively, under a generalized-risk theory, also known as a "dangerous conditions claim," the plaintiff may demonstrate that the prison conditions "were so dangerous that they resulted in cruel and unusual punishment." *Id.* It is unclear whether plaintiff is proceeding under only the particularized-risk theory or both theories. Accepting the allegations in the light most favorable to the plaintiff, the court will proceed assuming she asserts both theories.

Under the particularized-risk theory, the defendants failed to protect the decedent from the specific threat posed by Boss Hog. After Boss Hog initially assaulted Wells, the risk that Boss Hog would attack him again was substantial and obvious. In fact, the amended complaint asserts that standard prison practice required the separation of inmates who fight precisely because the risk of a subsequent fight would be significant if the two were not set apart.

Plaintiff also alleges that all defendants, according to the amended complaint, are liable based on the dangerous conditions at Easterling. "[O]ccasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment"; however, "an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm." *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga*, 400 F.3d 1313, 1320 (11th Cir. 2005). The attacks on decedent Wells were "two of many violent episodes at

Easterling." Am. Compl. (Doc. 32) ¶ 40. The facility housed twice as many inmates as it was designed to hold and was understaffed when Wells died. In addition, at least at the time of Wells's death, the facility was poorly supervised given that those on duty congregated in a less violent dorm to watch football instead of tending to their occupational responsibilities. Aside from certain exceptions, inmates were not separated based on their proclivity for violence. Violent and nonviolent inmates, and inmates with severe mental illness and those without, resided together in dormitories. Moreover, prior to Wells's death, Easterling had been a target of ADOC's 'Operation Restore Order,' an effort to regain control of the facility and reduce contraband by conducting unannounced institutional searches at ADOC facilities.[4]

---

4. The court takes judicial notice of facts from ADOC reports cited by the parties in their briefs since such facts are "not subject to reasonable dispute" and "can be accurately and readily determined from sources

The Eleventh Circuit has repeatedly found that the combination of overcrowding, understaffing, inadequate supervision, presence of contraband, and regular incidents of violence in a correctional setting can create a substantial risk of serious harm. *See, e.g., Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Hale*, 50 F.3d at 1583; *LaMarca v. Turner*, 995 F.2d 1526, 1532-33 (11th Cir. 1993). Accordingly, the complaint asserts substantial risk of serious harm to Wells under both theories.

Notably, the defendants do not contest that Wells was subjected to a substantial risk of serious harm.

---

whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking judicial notice at the motion-to-dismiss stage of certain facts in public reports whose authenticity could not be reasonably questioned).

## 2. Deliberate Indifference

In addition to demonstrating that the inmate was exposed to an objectively substantial risk of serious harm, a plaintiff must show that each defendant acted with deliberate indifference to that risk. Deliberate indifference has three elements: (1) the official was subjectively aware of the risk but (2) disregarded that risk by (3) engaging in conduct that amounts to "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). To establish subjective recklessness, a plaintiff must show "that the defendant actually knew that his conduct--his own acts or omissions--put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1253. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a

13

factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

The court must determine whether the facts in the amended complaint plausibly allege that the defendants actually knew that their conduct, through acts or omissions, put decedent Wells at a substantial risk of serious harm, and they nevertheless disregarded that risk.

### a. Subjective Awareness of a Specific Threat

The amended complaint plausibly alleges that the defendants actually knew about the particularized threat that Boss Hog posed to decedent Wells. Plaintiff asserts that "the initial fight would have prompted an incident report of which [the defendants] would have been informed, if indeed they did not actually receive or see copies of the report itself."

14

Am. Compl. (Doc. 32) ¶ 29.  Defendants argue that this
allegation is insufficient to show that the defendants
had subjective knowledge of the first altercation.
They aver that the phrase "would have been informed"
does not allege that they were *actually* informed of the
incident and, thus, the complaint fails to state a
plausible claim.  *See* Defs.' Mot. to Dismiss (Doc. 36)
at 6-7.  Admittedly, these allegations regarding the
defendants' knowledge of a particular threat to Wells
are sparse and make the particularized-risk claim a
close call.  However, the standard at the
motion-to-dismiss stage is one of plausibility, not
probability.  The amended complaint asserts obvious
dereliction of duty by the defendants, as well as a
lack of transparency from the defendants to the
decedent Wells's family regarding the circumstances of
Wells's death and any subsequent investigation.  Thus,
the scant detail in the allegations reflects the
information asymmetry that generally exists between

15

plaintiff and defendant pre-discovery and justifies why the motion-to-dismiss standard draws all reasonable inferences in the plaintiff's favor.

Therefore, taking the allegations in the complaint in the light most favorable to the plaintiff, the defendants would have had notice of the danger Boss Hog posed to Wells's safety. Easterling's normal prison practice is to separate inmates who fight with one another unless they sign a peace agreement, specifically because, after one altercation, the same inmates pose a substantial and obvious risk that they may fight again. Thus, even if the defendants deny subjective knowledge that Wells was exposed to a specific threat of serious harm, the amended complaint pleads that they had actual notice of Boss Hog's initial attack on Wells, and, thus, a factfinder could conclude that the defendants knew of the substantial risk Boss Hog posed to Wells "from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

16

### b. Subjective Awareness of Dangerous Conditions at Easterling

Wells also seems to plead a generalized-risk claim against the five defendants. McCovery, Lovejoy, Canty, Key, and Crittenden do not meaningfully address whether decedent Wells has stated an Eighth Amendment claim based on the dangerous conditions at Easterling. Instead, they insist that, without subjective knowledge of a particularized threat to Wells's safety, they cannot be held liable. Supreme Court and Eleventh Circuit precedent disprove the defendants' assertion: "It does not matter whether the risk came from a particular source or whether a prisoner faced the risk for reasons personal to him or because all prisoners in his situation faced the risk." *Id.* at 826.

Although generalized-risk claims are typically brought against higher-level prison officials, nothing precludes a plaintiff from bringing such a claim

17

against lower-level correctional staff. Regardless of whom the claim is brought against, "to demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition." *LaMarca*, 995 F.2d at 1536. In other words, the plaintiff must show that the official "had the capability (authority and means) to provide adequate security and did not do so." *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982).

According to the amended complaint, the defendants were each subjectively aware of the dangerous conditions at Easterling and the increased risk of inmate-on-inmate violence those conditions posed, especially in unsupervised dormitories. The complaint, therefore, states sufficient facts to show that the risk of inmate-on-inmate violence at Easterling was "obvious." *Farmer*, 511 U.S. at 842.

At the time of Wells's death, "Easterling's

staffing level was perilously low."[5]    Am. Compl.
(Doc. 32) ¶ 46.  The correctional facility "had gotten
so far out of control in 2022 that it was made the
subject of 'Operation Restore Order,' a highly
publicized (but unsuccessful) effort by the Alabama
Department of Corrections to reduce contraband and
thereby regain control of the facility." *Id.* at 2.  As
evidenced by Boss Hog's access to the knife he used to
slit Wells's throat, inmates continued to possess
deadly weapons after Operation Restore Order.
Easterling "housed twice as many inmates as it was
designed to hold."  *Id.* ¶¶ 45-46.  Additionally,
first-time inmates resided in the same dorms with
long-time violent offenders, many of whom were
suffering from untreated or poorly treated severe

---

    5.  The court is aware of the low staffing at
Easterling mentioned in ADOC reports and in other
Department of Justice reports; however, plaintiff
should have cited the precise document she is relying
upon in her complaint, and all parties should do so for
any references in the future.

mental illnesses.  Furthermore, Easterling's custom and policy required at least one corrections officer (in addition to the cubicle officer) to be present in order to open the door to the dormitory where Wells and Boss Hog resided.  Even in emergencies, the cubicle officer could not leave his or her position to unlock the dorm door without another corrections officer present.  This policy permits an "inference from circumstantial evidence" that at least one other corrections officer should have been present in or near the dormitory where Boss Hog killed Wells.  *Farmer*, 511 U.S. at 842.

Easterling's characteristics at the time of Wells's death were akin to those at the Butler County Jail in *Marsh v. Butler County, Alabama*, 268 F.3d 1014 (11th Cir. 2001).  There, staff did not provide adequate security, inmates possessed dangerous contraband, and staff did not properly classify and segregate inmates based on their propensity for violence and other relevant qualities.  *See id.* at 1029.  Therefore, the

20

court denied the defendant prison official's motion to dismiss because it concluded that the defendant knew of the dangerous conditions at Butler County Jail, understood that these conditions increased the risk of violence, and failed to take any action in response. *See id.; see also Hale*, 50 F.3d 1579; *Brown v. Dunn*, 760 F. Supp. 3d 1326 (M.D. Ala. 2024) (Thompson, J.).

While the five defendants may not have been able to control the policies that contributed to overcrowding and understaffing, they were aware of Easterling's dangerous conditions, and they could control their own behavior. It does not require expertise to deduct that five on-duty officers convening in one dormitory--notably a dorm where violence is less prevalent--to watch television instead of doing their job and overseeing inmates increases the risk of inmate-on-inmate violence. Such a deduction is "obvious." *Farmer*, 511 U.S. at 842. The defendants "had the capability (authority and means) to provide

21

adequate security and did not do so." *Williams*, 689
F.2d at 1389. Accordingly, the court finds that the
plaintiff has plausibly pleaded that the defendants
each had subjective knowledge of the risk of
inmate-on-inmate violence and were deliberately
indifferent to that risk.

Therefore, regardless of whether the plaintiff is
asserting only a particularized-risk theory or both a
particularized-risk and a generalized-risk theory, the
court finds that the allegations plausibly assert that
the defendant officers subjectively knew that their
conduct put Wells at risk of serious harm.

"[P]rison officials who actually knew of a
substantial risk to inmate health or safety may be
found free from liability if they responded reasonably
to the risk, even if the harm ultimately was not
averted." *Farmer*, 511 U.S. at 844. Therefore, a
plaintiff must show that the defendant's response was
objectively unreasonable. *See id.* at 846.

22

The defendants do not argue that their response was
reasonable; nor could they.  Indeed, the defendants did
not address the initial attack in *any* manner, let alone
a reasonable manner; rather, they continued to watch a
televised football game all together in a dorm that
required less supervision.


## 3. Causation

Finally, after showing that the defendants were
deliberately indifferent, the plaintiff must
demonstrate that the constitutional violation caused
decedent Wells's death. *See Caldwell v. Warden, FCI
Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).  A
plaintiff demonstrates a causal connection where she
shows that the defendant "(1) 'had the means
substantially to improve' the inmate's safety, (2)
'knew that the actions he undertook would be
insufficient to provide the inmate with reasonable
protection from violence,' and (3) had 'other means

available to him which he nevertheless disregarded.'"
*Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611,
622 (11th Cir. 2007) (quoting *LaMarca*, 995 F.2d at
1539).

Notably, the defendants do not contest that if
Wells has plausibly pleaded deliberate indifference,
there is a causal link between the defendants' conduct
and Wells's death.  Nor could they.  The plaintiff
pleads that the defendants learned of Boss Hog's
initial attack on Wells and ignored standard protocol
to separate the inmates.  A reasonable jury could find
their indifference caused Wells's death.  And the
general dangerous conditions, "where violent prisoners
are allowed free reign of a [prison] with easy access
to weapons without proper supervision by guards could
be found to have caused the assault[]" on Wells.
*Marsh*, 268 F.3d at 1029.  The defendants knew that
watching football instead of supervising the dorms more
susceptible to violence "would be insufficient to

provide inmates with reasonable protection from violence, and that other means were available to [them] which [they] nevertheless disregarded." *LaMarca*, 995 F.2d at 1539.

Therefore, the court finds that plaintiff has sufficiently met her burden at the motion-to-dismiss stage by plausibly alleging all three components of a failure-to-protect claim: substantial risk of serious harm, deliberate indifference, and causation.

## B. Supervisory-Liability Claim

The defendants also argue that the plaintiff fails to state a supervisory-liability claim. However, the plaintiff admits that the complaint does not contain such a claim. Accordingly, because the plaintiff does not currently assert a supervisory-liability claim, the motion to dismiss will be denied as to such a claim.

25

## C. Wrongful-Death

The plaintiff's response to the motion to dismiss includes a sentence stating: "The fact, if it is a fact, that none of the movants [were] in the dormitory where Boss Hog first attacked [Wells] ... does not mean that Angela Wells cannot state a claim for wrongful death." Pl. Resp. (Doc. 38) at 4. The defendants cautiously point out plaintiff's word choice and request that the court acknowledge that Wells does not assert a wrongful-death claim. Because the plaintiff's complaint includes no mention of the term 'wrongful death,' does not cite Alabama's wrongful-death statute, and does not list an Alabama wrongful-death claim in the counts, the court finds that no state wrongful-death claim was asserted in the complaint.

## IV.  CONCLUSION

Wells can hold the defendants liable under the Eighth Amendment by showing that they knew of either a specific threat to decedent Wells's safety or were deliberately indifferent to an excessive risk of violence at Easterling.  Because she has plausibly alleged both, the motion to dismiss will be denied.

* * *

Accordingly, it is ORDERED that defendants Jennifer McCovery, Danarris Lovejoy, Steven Canty, Kelvin Key, and Anthony Crittenden's motion to dismiss (Doc. 36) is denied.

DONE, this the 21st day of August, 2025.

<u>   /s/ Myron H. Thompson   </u>
UNITED STATES DISTRICT JUDGE

27